IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>KEVIN LAVAL WILLIAMS,<br><br>    Defendant. | CRIMINAL CASE NO.<br>1:21-CR-00362-LMM-LTW |

## FINAL REPORT AND RECOMMENDATION AND
## ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is before the Court on a Motion to Dismiss the Indictment ([Doc. 17]) filed by Defendant Kevin Laval Williams. The Government filed a response in opposition. ([Doc. 19]). Defendant filed a reply. ([Doc. 21]). The matter is ripe for review and, for the reasons detailed below, the undersigned **RECOMMENDS** that Defendant's Motion ([Doc. 17]) be **DENIED**.

## BACKGROUND

Defendant is charged with one count of possession of a firearm in or affecting commerce after being convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1) and 924(e). [Doc. 1 at 1-2]. The indictment states that Defendant, knowing that he had previously been convicted

of a felony, knowingly possessed a Springfield Armory XD40 .40 caliber handgun in and affecting interstate and foreign commerce. [Id.].

## LEGAL ANALYSIS

Relying on the Supreme Court's recent decision in New York State Rifle & Pistol Assn., Inc. v. Bruen, 142 S. Ct. 2111 (2022), Defendant contends § 922(g)(1) is unconstitutional under the Second Amendment. [Doc. 17 at 2]. Defendant argues that the framework established by Bruen abrogated prior Eleventh Circuit precedent rejecting constitutional challenges to § 922(g)(1). [Doc. 17 at 4]. Defendant asserts that the Government "cannot meet its burden to show that § 922(g)(1) complies with the Nation's tradition of firearm regulation." [Id.]. The Government contends § 922(g)(1) "is sufficiently analogous to historical regulations to fall within the nation's long-standing tradition of disarming citizens who are not engaging in lawful activity or are otherwise law-abiding." [Doc. 19 at 3].

### A.   New York State Rifle & Pistol Assn., Inc. v. Bruen

In Bruen, the Supreme Court held that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun outside the home for self-defense." 142 S. Ct. at 2122. The Supreme Court concluded that to justify a firearm regulation "the government must demonstrate that the regulation is consistent with this

2

Nation's historical tradition of firearm regulation." Id. at 2126.  The Bruen Court explained that the "historical understanding" of the Second Amendment illustrates that "the right secured by the Second Amendment is not unlimited." Id. at 2128.  However, Bruen emphasized that "historical limitations on the right to bear arms" were not meant to prevent "law-abiding citizens with ordinary self-defense needs" from exercising their right.  Id. at 2150.

The Supreme Court held that means-end scrutiny is inapplicable in the Second Amendment context. Id. at 2125–26.  Instead, the Bruen Court stated that the following framework is appropriate when analyzing firearm regulations' constitutionality:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2129–30 (citation omitted).

Defendant contends that Bruen is irreconcilable with Eleventh Circuit precedent relying on the "presumptively lawful" analysis used in D.C. v. Heller, 554 U.S. 570 (2008).  [Doc. 17 at 9].  Specifically, Defendant argues that the Eleventh Circuit's opinion in United States v. Rozier, 598 F.3d 768 (11th Cir. 2010) should be

3

reconsidered. The Government asserts that Heller, McDonald,[1] and Bruen are consistent with the Eleventh Circuit's rejection of Second Amendment constitutional challenges to § 922(g)(1). [Doc. 19 at 10].

The Bruen opinion did not consider the validity of § 922(g)(1) because "petitioners were 'law-abiding' and not felons." United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 *9 (N.D. Okla. Sept. 21, 2022). But the Bruen Court did clarify that its holding was "in keeping with Heller." Bruen, 142 S. Ct. at 2126. Heller impliedly recognized § 922(g)(1) as "a presumptively lawful longstanding prohibition." 554 U.S. at 626, 627 n.26. The concurring opinions of Justice Alito and Justice Kavanaugh, joined by Chief Justice Roberts, went even further and explicitly stated that Heller's prohibition on the possession of firearms by felons remains intact. Bruen, 142 S. Ct. at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in Heller or McDonald"); Bruen, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . .") (quoting

---

[1] McDonald v. Chicago, 561 U.S. 742 (2010).

McDonald v. Chicago, 561 U.S. 742, 786 (2010)). Defendant's Motion to Dismiss fails to address this.

Unsurprisingly, courts have consistently concluded that regulations restricting felons from possessing firearms survive Bruen and upheld the constitutionality of § 922(g)(1). See United States v. Carrero, No. 2:22-CR-00030, 2022 WL 9348792, at *3–4 (D. Utah Oct. 14, 2022) (collecting cases). Defendant fails to cite any case where a court applying Bruen has held that § 922(g)(1) is unconstitutional. For the reasons below, the concludes that § 922(g)(1) is constitutional.

### a. Textual Analysis

Defendant also argues that he is a "part of 'the people'" protected by the Second Amendment and that the Second Amendment's plain text covers his conduct. [Doc. 17 at 10–11]. The Government contends Defendant's conduct is not covered by the Second Amendment's text because only "law-abiding, responsible citizens" have the right to bear arms, not felons. [Doc. 19 at 8].

The plain text of the Second Amendment states, "the right of the people to keep and bear Arms, shall not be infringed," and is not qualified. U.S. CONST. amend. II; see United States v. Price, No. 22-CR-00097, 2022 WL 6968457, at *7 (S.D. W. Va. Oct. 12, 2022) (stating that the Second Amendment's plain text contains no

5

"qualification that Second Amendment rights belong only to individuals who have not violated any laws"). In Heller, the Supreme Court determined that "the people" in the Second Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." Heller, 554 U.S. at 580; see also Coombes, 2022 WL 4367056 at *3. Heller also concluded that "the people" is consistent with those who are covered under the First and Fourth Amendments. Heller, 554 U.S. at 580–81 (noting that "in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset."). Because the First and Fourth Amendments protections of "the people" have been found in some degree to cover felons based on the plain text, there is nothing to suggest that there should be a difference in the Second Amendment context. See Coombes, 2022 WL 4367056 at *4.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Bruen, 142 S. Ct. at 2126. As the Bruen Court stated, the Second Amendment "guarantees the individual right to possess and carry weapons in case of confrontation." Id. at 2135 (citing Heller, 554 U.S. at 592). Because the possession of a firearm for self-defense is the kind of conduct the

Supreme Court has recognized as constitutionally protected, Defendant's possession of a firearm for that purpose is presumably covered by the Second Amendment's plain text.

### b. Historical Analysis

Assuming the Second Amendment presumptively protects Defendant's conduct, the Government has the burden of affirmatively proving that "its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 142 S. Ct. at 2127. If § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century," the historical inquiry is "straightforward." Bruen, 142 S. Ct. at 2131; see Collette, 2022 WL 4476790 at *4. However, in addition to using a straightforward historical analysis, finding a "historical analogue" that is "relevantly similar" to the modern regulation is also sufficient. Bruen, 142 S. Ct. at 2132.

Defendant argues that "the Government cannot show 'an American tradition' that individuals convicted of a felony may not possess firearms." [Doc. 17 at 11]. Specifically, Defendant contends that there is no "precursor to § 922(g)(1)'s broad, class-based ban and that § 922(g)(1) does not comport with English, colonial, founding era, or 19th century history because felons were never permanently banned from

7

firearm possession." [Doc. 17 at 13, 15, 21]. Defendant contends that England never tried to disarm all felons and only disarmed those who possessed a firearm "with evil or malice" as opposed to "knowingly" possessing under § 922(g)(1). [Id. at 13–15]. In response, the Government notes that many colonies did disarm individuals. [Doc.19 at 14]. Even before Bruen, courts reviewed the historical record and found that early American settlers recognized the safety issues that arise with an unlimited right to bear arms and limited this right for those "perceived" as dangerous. United States v. Carter, 669 F.3d 411, 415 (4th Cir. 2012) (noting that "the Anglo–American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous"). Consistent with this history, Congress enacted § 922(g)(1) to address issues that arise from firearm possession by individuals perceived to pose a risk to society. United States v. Yancey, 621 F.3d 681, 683 (7th Cir. 2010) ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people.").

The Fifth Circuit specifically addressed the issue of felons being disarmed during the colonial and English eras. United States v. Emerson, 270 F.3d 203, 226 n.21 (5th Cir. 2001) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded . . . felons [from possessing firearms].")

(citing Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign?, 36 OKLA. L. Rev. 65, 96 (1983)). The Emerson Court recognized that an individual's Second Amendment right can have "narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." Id. at 261. Based on this analysis, the Fifth Circuit concluded that "it is clear that felons" can be "prohibited from possessing firearms." Id. Notably, Emerson was not overturned by Bruen.

Regarding the founding era, Defendant argues that no primary source links the right to bear arms to a virtuous citizen and that only civic rights (not individual rights) were stripped from the unvirtuous by the Framers. [Doc. 17 at 20–21]. While the Second Amendment lacks such an explicit limit, historical evidence indicates that this limit was widely understood and that felons were excluded from the right. United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 *12 (E.D. Va. Oct. 13, 2022). A host of evidence during the founding era supports the conclusion that the right to bear arms was reserved for "virtuous citizen[s]"and that the right was treated as a civic right. See Yancey, 621 F.3d at 684-685 (suggesting that the Second Amendment was limited to "virtuous" persons); see also United States v. Rene E., 583

F.3d 8, 15 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right . . . limited to those . . .who were deemed capable of exercising it in a virtuous manner.") (quoting Saul Cornell, "Don't Know Much About History" The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 679 (2002) (internal footnotes omitted)).  Accordingly, it has been widely recognized that the Second Amendment right being tied to a virtuous citizenry meant that "the government could disarm 'unvirtuous citizens.'" United States v. Daniels, No. 03-CR-00083, 2022 WL 5027574, at *4 (W.D.N.C. Oct. 4, 2022) (citing United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir. 2010).

Additionally, Defendant contends "no Founding-era statutes or interpretations of the common law barred all felons from possessing firearms" permanently. [Doc. 17 at 16].  During the states' constitutional ratification conventions, three proposals were made regarding restrictions on the right to bear arms. See Coombes, 2022 WL 4367056 *6 ("no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals.") (citing 2 Bernard Schwartz, The Bill of Rights: A Documentary History, 665 (1971); ("Congress shall never disarm any citizen, unless such as are or have been in actual rebellion.") (citing

1 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution, 326 (1836)); (the right to keep arms extended only to 'peaceable citizens,' not to criminals") (citing Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms, 206 (updated ed. 2008)). Defendant contends that these proposals are a weak source of evidence because they were not included in the final text. [Doc. 17 at 18].

However, these proposals did not fail because Americans objected to them on Second Amendment grounds. See Coombes, 2022 WL 4367056, at *7. The proposals failed because the Federalists did not support the Bill of Rights as a whole. Id. Heller has even recognized one of these proposals as a "'highly influential' 'precursor' to the Second Amendment." United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (quoting Heller, 554 U.S. at 604). Accordingly, these proposals provide persuasive historical evidence that the Second Amendment was intended to be limited to certain classes of citizens that excluded felons.

Defendant contends that not all convicted felons are presently violent and that "historical regulations required an individualized assessment of a person's threat to society." [Doc. 17 at 12]. However, there is evidence of blanket prohibitions disarming both violent and nonviolent individuals in the founding era. Riley, 2022 WL 7610264

11

*12; see also Medina v. Whitaker, 913 F.3d 152, 158–59 (D.C. Cir. 2019) (outlining historical practices used to disarm "unvirtuous citizens" during the founding era). The historical evidence presented in Medina supports the conclusion that blanket prohibitions on firearm possession by felons, similar to § 922(g)(1), are consistent with founding era practices. Medina, 913 F.3d at 158–59 (noting that multiple circuits, and scholars recognize "persuasive evidence that the scope of the Second Amendment was understood to exclude more than just individually identifiable dangerous individuals").

During the founding era, the ability to exercise the right to bear arms was determined by the risk the individual posed to society. See Riley, 2022 WL 7610264 *12 (emphasis added) (stating that "the political community's perception of the danger an individual *may* pose to its lawful function." see Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wy. L. Rev. 249, 262 (2020) ("Americans continued some English arms traditions, including the tradition of disarming those *perceived* as dangerous.") (emphasis added); id. at 264-65 (describing the numerous colonial disarmament laws for those considered "dangerous").

Because convicted felons are considered "presumptively risky," § 922(g)(1) prohibiting felons from possessing firearms is consistent with historic regulations that

disarmed individuals who threatened society. Yancey, 621 F.3d at 683; Daniels, 2022 WL 2654232, at *3 ("Congress may prohibit those who pose a risk to society, like felons, from exercising the right to bear arms."). In this case, the Government has shown that § 922(g)(1) is consistent with historical firearm regulations. The Eleventh Circuit's reliance on Heller's analysis in Rozier is not "irreconcilable" with Bruen. For the foregoing reasons, the undersigned **RECOMMENDS** that the Motion to Dismiss the Indictment ([Doc. 17]) be **DENIED**.

## CONCLUSION

The undersigned **RECOMMENDS** that Defendant's Motion to Dismiss the Indictment ([Doc. 17]) be **DENIED**. There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED, REPORTED, AND RECOMMENDED**, this __14__ day of November, 2022.

_Linda T. Walker_
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE